UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>UNITEDHEALTH GROUP, INC., and<br>PACIFICARE HEALTH SYSTEMS, INC.,<br><br>Defendants. | Case Number:  1:05CV02436<br><br>Judge Ricardo M. Urbina<br><br>Filed: March 3, 2006 |

## COMPETITIVE IMPACT STATEMENT

Pursuant to Section 2(b) of the Antitrust Procedures and Penalties Act ("APPA"), 15

U.S.C. § 16(b)-(h), the United States submits this Competitive Impact Statement to assist the

Court in assessing the proposed Amended Final Judgment submitted for entry in this civil

antitrust proceeding.

I.

## NATURE AND PURPOSE OF THIS PROCEEDING

The United States filed a civil antitrust Complaint under Section 15 of the Clayton Act,

15 U.S.C. § 25, on December 20, 2005, alleging that the proposed acquisition by UnitedHealth

Group, Inc. ("United") of PacifiCare Health Systems, Inc. ("PacifiCare") would violate Section 7

of the Clayton Act ("Section 7"), 15 U.S.C. § 18.

The Complaint alleges that the proposed acquisition may substantially lessen competition in the following markets: (i) the sale of commercial health insurance plans to small-group employers (those with 2-50 employees) in the Tucson, Arizona Metropolitan Statistical Area ("MSA"); (ii) the purchase of physician services in the Tucson MSA; (iii) the purchase of physician services in the Boulder, Colorado MSA; and (iv) the sale of commercial health insurance plans and the purchase of health care provider services in numerous MSAs throughout California.

When the Complaint was filed, the United States also filed a proposed settlement that would permit United to complete its acquisition of PacifiCare but would require divestitures of certain assets and injunctive relief sufficient to preserve competition in the sale of commercial health insurance to small-group insurers in Tucson, the purchase of physician services in Tucson and Boulder, and the sale of health insurance and purchase of physician and hospital services in California.

The United States filed a proposed Amended Final Judgment on March 2, 2006 which will allow United to offer in-network benefits to new members requiring medical care in the State of California pending completion of certain operational steps necessary for United to transition to the PacifiCare network.

Plaintiff and Defendants have stipulated that the proposed Amended Final Judgment may be entered after compliance with the APPA. Entry of the proposed Amended Final Judgment would terminate this action, except that the Court would retain jurisdiction to construe, modify,

or enforce the provisions of the proposed Amended Final Judgment and to punish violations thereof.

## II.

## THE ALLEGED VIOLATIONS

A.     The Defendants

United is a Minnesota corporation with its principal place of business in Minnetonka, Minnesota. It offers a variety of HMO, PPO, Point-of-Service ("POS") health plans, Self-Directed Health Plans ("SDHP"), and other products. United also purchases physician services for its health plan members, which it offers to members through United's health plans.  United is one of the leading health insurers in the United States and reported in excess of $37 billion in revenues for 2004.

PacifiCare is a Delaware corporation with its principal place of business in Cypress, California.  Like United, PacifiCare offers group health insurance products, such as HMOs, PPOs, Exclusive Provider Organizations ("EPOs"), and SDHP, and also buys physician services, which it offers to its members through PacifiCare's health plans.  PacifiCare reported $12.2 billion in revenues for 2004.

B.     The Acquisition

United entered into an Agreement and Plan of Merger ("Agreement") with PacifiCare dated July 6, 2005.  Pursuant to the terms of the Agreement, PacifiCare merged into United on December 20, 2005, after the defendants received all of the necessary regulatory approvals.

3

PacifiCare shareholders received 1.1 shares of United stock and $21.50 cash for each PacifiCare share owned.

C.     Anticompetitive Effects of the Acquisition

1.     The Sale of Health Insurance to Small-Group Employers in the Tucson MSA

The Complaint alleges that United's proposed acquisition of PacifiCare is likely to substantially lessen competition in the sale of commercial health insurance to small-group employers in Tucson, Arizona in violation of Section 7 of the Clayton Act.

a.     The Sale of Commercial Health Insurance to Small-Group Employers
is a Relevant Product Market

Commercial health insurance companies, such as United and PacifiCare, contract with employers and other groups to provide health insurance services.  The market for the sale of commercial health insurance to small-group employers is separate from the market for the sale of such insurance to larger groups.

Unlike larger-group employers, small-group employers cannot feasibly self fund their employees' health benefits.  They do not have a sufficient employee population across which they can spread financial risk, nor do they typically have multiple locations that reduce risk through geographic diversity.  Because self funding is not a viable option for small-group employers, they would not switch to self funding in sufficient numbers to make a small but significant increase in the price of fully-insured health plans to all small-group employers unprofitable.

4

The different markets are also evident in the ways that commercial health insurance is regulated, sold, and purchased. Many states have regulations that apply only to the sale of commercial health insurance to small-group employers. In Arizona, state law defines small employers as those having 2-50 employees, and certain statutes apply specifically to insurance sold to those groups. A.R.S. § 20-2301(A)(22). See, e.g., A.R.S. §§ 20-2304, 20-2311.

The way in which commercial health insurance is sold also distinguishes the small and large group markets. Commercial health insurers, like United and PacifiCare, engage in extensive negotiations over price and other contract terms with large employers. These negotiations result in different large groups paying different prices for health plans from the same insurer. In contrast, commercial health plans conduct fewer and more limited negotiations with small-group employers. The insurer often sets the price at which it offers its health plans to small groups and those groups decide to accept or reject largely based on public information.

Because of these differences in the way that commercial health insurance is sold to large and small groups, health insurers employ staff dedicated solely to marketing and selling commercial health insurance plans to small-group employers, and develop and implement separate strategic plans for such customers. Rather than employ dedicated benefit administrators, small-group insurers are more likely to rely on brokers, who frequently specialize in working with small-group employers, to assist in various aspects of an employer's sponsorship of a health benefit plan, such as plan design consultation, and assistance with the bidding process.

Health insurers, brokers, state insurance commissions, and the purchasers themselves consider the small-group market to be separate and distinct.

5

   b.  The Tucson MSA is a Relevant Geographic Market

  Health insurance plan enrollees seek relationships with physicians and other health care professionals and institutions that are located in the metropolitan area in which they live and work. Commercial health insurers and brokers consider the area in and around Tucson, Arizona to be a separate and distinct area for the sale of health plans to small-group employers. The United States Department of Commerce has defined the area in and around Tucson, Arizona as an MSA.

   c.  Competitive Effects in the Market for the Sale of Commercial Health Insurance to Small-Group Employers in the Tucson MSA

  Small-group employers rely on competition to keep health benefit plans affordable. Before the merger, small-group employers in Tucson could choose between United, PacifiCare, and one or two other options. PacifiCare was the low-price competitor in the market, an important consideration for small-group employers, which tend to be especially price-sensitive.

  United and PacifiCare were the second and third largest sellers of commercial health insurance in Tucson. Market shares drop off substantially after the top three insurers. With few alternatives and no low-cost alternative, the merged entity would have been able to increase prices or reduce the quality of its health plans offered to small-group employers.

  2.  The Purchase of Physician Services in the Tucson and Boulder MSAs

  United's acquisition of PacifiCare will also increase its purchasing power over physician services in the Tucson and Boulder MSAs, which would enable United to reduce the rates paid for those services.

a.    The Purchase of Physician Services is a Relevant Product Market

Physician services are those medical services provided and sold by physicians.  The only purchasers of these services are individual patients or commercial and government health insurers that purchase these services on behalf of individual patients.  As a result, physicians cannot seek other purchasers in the event of a small but significant decrease in the prices paid by these buyers.  Nor will such a price decrease cause physicians to stop providing their services or shift towards other activities in numbers sufficient to make such a price reduction unprofitable.

b.    The Tucson and Boulder MSAs are Relevant Geographic Markets

Like the sale of commercial health insurance, the market for physician services is local.  Patients choose physicians in the metropolitan area in which they live and work.  Physicians invest time and expense in building a practice and would incur costs in moving to a new geographic area.  Therefore, a decrease in the price paid to physicians in Tucson or Boulder would not cause physicians to relocate their practices in numbers sufficient to make such a price reduction unprofitable.  The United States Department of Commerce has defined the areas in and around Tucson, Arizona and Boulder, Colorado as MSAs.

c.    Competitive Effects in the Market for the Purchase of Physician Services in the Tucson and Boulder MSAs

The contract terms a physician can obtain from a commercial health insurance company like United depend on the physician's ability to terminate (or credibly threaten to terminate) the relationship if the company demands unfavorable contract terms.  A physician's ability to terminate a relationship with a commercial health insurer depends on hi or her ability to replace

7

the amount of business lost from the terminated insurer's patients, and the time it would take to do so. Failing to replace lost business expeditiously is costly.

Physicians have only a limited ability to encourage patients to switch health plans. To retain a patient after terminating a plan requires the physician to convince patients to either switch to another employer-sponsored plan in which the physician participates or to pay considerably higher out-of-pocket costs, whether in the form of increased copayments for use of an out-of-network physician or by absorbing the total cost of the services. As a result, a physician who terminates his or her relationship with United, for example, could expect to lose a significant share of his or her United patients. The ability to make up that lost business is diminished when a physician's non-United sources of patients are more limited. Consequently, the cost of replacing United patients will be greater the larger United's share of all patients in an area.

United's acquisition of PacifiCare will give it control over both a large share of revenue of a substantial number of physicians in Tucson and Boulder and a large share of all patients in those areas. Since physicians have a limited ability to encourage patient switching, the merger will significantly increase the number of physicians in Tucson and Boulder who are unable to reject United's demands for more adverse contract terms. Thus, the acquisition will give United the ability to unduly depress physician reimbursement rates in Tucson and Boulder, likely leading to a reduction in quantity or degradation in the quality of physician services.

3.    The Sale of Commercial Health Insurance and the Purchase of  Health Care
      Provider Services in California

Before its acquisition of PacifiCare, United did not actively sell commercial health

insurance in California.  Its California membership consisted of employees of large, national or

regional employers that self-fund their health benefit plans and use United only for

administrative services.

Since 2000, United has rented the provider networks of CareTrust Networks, a wholly-

owned subsidiary of Blue Shield of California ("Blue Shield"), to serve its California-based

commercial members.  Blue Shield is one of the largest commercial health insurers in California,

with substantial membership throughout the state.  PacifiCare and Blue Shield are among each

other's principal competitors for the sale of commercial health insurance and for the purchase of

physician and hospital services.   As a result of the transaction, United obtained PacifiCare's

California membership and became one of Blue Shield's principal competitors for the sale of

commercial health insurance and the purchase of provider services.

a.    Relevant Product Markets and Geographic Markets in California

PacifiCare, and now United, competed with Blue Shield in the sale of commercial health

insurance to groups of all sizes.  Similarly, PacifiCare competed with Blue Shield to acquire

health care provider services, from both physicians and hospitals, in MSAs throughout the state.

b.    Competitive Effects in the Markets for the Sale of Commercial Health
      Insurance and the Purchase of Health Care Provider Services

United's acquisition of PacifiCare creates the potential for both coordinated and unilateral

anticompetitive effects.  Through its acquisition of PacifiCare, United assumed PacifiCare's

place in the California markets for the sale of commercial health insurance and the purchase of

healthcare provider services and thus became one of Blue Shield's most important competitors.

United and Blue Shield will have access to highly sensitive competitive information about the

other company, dramatically increasing each company's ability to coordinate prices charged for

commercial health insurance and prices paid to health care providers.  Similarly, the importance

of this relationship may lead each company to be less aggressive when negotiating with employer

groups or assembling provider networks.

Pursuant to the network access agreement between United and CareTrust, United has

access to certain information about the CareTrust provider network (and thus about Blue Shield's

provider network), including provider contract negotiations and terminations, reimbursement and

claims processing issues, new commercial health insurance products, and network development.

The network access agreement requires Blue Shield to give United 90 days' notice if it changes

its fee schedules.  Similarly, United must inform Blue Shield of the development of any new

products.  In addition, the network access agreement also ties United's hospital reimbursement

levels to those of Blue Shield by requiring Blue Shield to use its best efforts to persuade hospitals

to accept reimbursement levels at a certain percentage of Blue Shield's reimbursement levels.

III.

## EXPLANATION OF THE PROPOSED AMENDED FINAL JUDGMENT

The proposed Amended Final Judgment is designed to eliminate the anticompetitive

effects identified in the Complaint by requiring United to divest certain commercial health

insurance contracts in the Tucson and Boulder MSAs.  It also requires United to stop exchanging

certain information with CareTrust Networks in California and, one year after entry of the Amended Final Judgment, to discontinue renting the CareTrust provider network.

In Tucson, the proposed Amended Final Judgment requires United to identify and divest commercial health insurance contracts covering at least 54,517 members who reside or work in the Tucson MSA. This is the total number of commercially insured members in Tucson that PacifiCare reported as of June 30, 2005. Although United has some discretion in determining which contracts to include in this divestiture package, it must include contracts covering at least 7,581 members covered by contracts with small-group employers – the number of Tucson-resident members covered under such small-group contracts that PacifiCare reported as of June 30. This divestiture addresses the competitive harms alleged in the Complaint by requiring United to divest enough small-group contracts to leave it with approximately the same market share of the small-group market, and the same number of commercially insured lives, that it had before acquiring PacifiCare.

The proposed Amended Final Judgment also prohibits United from requiring any physician practicing in the Tucson MSA, as a condition for participating in any of United's networks for its commercial health insurance products, to agree to participate in United's network for any Medicare health insurance product. Similarly, United will be prohibited from requiring Tucson physicians, as a condition for participating in any of its Medicare plans, to participate in any of its commercial health insurance plans. The prohibition against using this type of contractual requirement, commonly referred to as an "all-products" clause, was included in the proposed Judgment because a substantial percentage of PacifiCare's overall membership in Tucson was enrolled in its Medicare HMO plan marketed under the name Secure Horizons.

Many physicians in Tucson derived a substantial percentage of their revenue from patients enrolled in this plan.  This is relevant to the competitive effects in the market for the purchase of physician services because in calculating the percentage of a physician's revenue represented by United and PacifiCare, a physician's total revenue was taken into account – including from all commercial health plans, government programs such as Medicare and Medicaid, and private Medicare Advantage and Medicare HMO plans such as Secure Horizons. Without this injunction, United might have been able to use an all-products clause to force doctors in Tucson to participate in both its commercial and Medicare plans.  Had it done so, United might have accounted for a much larger share of the total payments for many physician practices in Tucson. The injunction against using such an all-products clause ensures that Tucson-area doctors will be free to choose whether to participate in United's networks for its commercial plans, its networks for its Medicare plans, or both.

In Boulder, the proposed Amended Final Judgment requires United to divest either the 6,066 members residing in the Boulder MSA who are covered under PacifiCare's current HMO contract with the University of Colorado, or an equivalent number of Boulder-area members covered under other contracts.  Unlike its Tucson membership, PacifiCare's membership in the Boulder MSA is concentrated in a smaller number of very large contracts.  Its HMO contract with the University of Colorado is its largest contract in Boulder; the 6,066 members residing in Boulder who are covered under that contract account for nearly half of PacifiCare's total commercial membership in Boulder.  Thus, PacifiCare's bargaining position in its negotiations with Boulder-area doctors would have been very different had it not had this HMO contract. Without that contract, PacifiCare's membership in Boulder would have been substantially less

12

and United's acquisition of that much smaller membership would not have generated the same

level of competitive concern that led the United States to challenge this transaction in the

Boulder market.  That, in addition to other facts relating to the insurance market in Boulder, led

the United States to conclude that the divestiture of the 6,066 members covered under the

University HMO contract (or the divestiture of an equivalent number of members covered under

other contracts) will be sufficient to remedy the competitive harm alleged in the Complaint.

Finally, an injunction against United using an all-products clause in Boulder was unnecessary

because PacifiCare's SecureHorizons enrollment in Boulder constituted a significantly smaller

percentage of its overall membership in Boulder compared to Tucson.

The divestitures in both Tucson and Boulder must be accomplished by selling or

conveying the contracts to one or more purchasers that, in the sole discretion of the United

States, will be viable, ongoing competitors in the relevant markets.  The divestitures (i) shall be

made to purchasers that each have the intent and capability (including the necessary managerial,

operational, technical, and financial capability) to compete effectively in the sale of commercial

health insurance products, and (ii) shall be accomplished so as to satisfy the United States that

none of the terms of any agreement between United and any purchaser gives United the ability to

interfere with the purchaser's ability to compete effectively.

In California, the proposed Amended Final Judgment requires United immediately to stop

exchanging certain kinds of information with CareTrust Networks, a wholly owned subsidiary of

Blue Shield.  United is prohibited from communicating with CareTrust about, among other

things, new product introductions, negotiations over rates or other terms with physicians, or the

development of any new provider networks.  Those kinds of information exchanges were part of

13

the basis for the competitive harm alleged in the Complaint. The proposed Amended Final Judgment also requires United to discontinue renting the CareTrust provider network entirely effective one year after entry of the Amended Final Judgment for customers existing before the transaction was completed. United is permitted to continue renting CareTrust's network for up to one year in order to minimize any disruption caused by the transition of its current members from the CareTrust provider network to the Pacificare network that United has acquired as part of this transaction.

The United States filed a proposed Amended Final Judgment to allow United's new customers (those receiving quotes after December 20, 2005, the day the Complaint and original Proposed Final Judgment were filed) to access the CareTrust Network until July 5, 2006. This modification will allow United to continue to offer in-network benefits to those members requiring such benefits in California. Using its newly acquired PacifiCare network for this purpose is impractical until United can complete the process of integrating certain features of the PacifiCare network and providers with its existing United claims processing and administrative systems

IV.

REMEDIES AVAILABLE TO POTENTIAL PRIVATE LITIGANTS

Section 4 of the Clayton Act (15 U.S.C. § 15) provides that any person who has been injured as a result of conduct prohibited by the antitrust laws may bring suit in federal court to recover three times the damages the person has suffered as well as costs and reasonable attorney's fees. Entry of the proposed Amended Final Judgment will neither impair nor assist the

bringing of any private antitrust damage action. Under the provisions of Section 5(a) of the Clayton Act (15 U.S.C. § 16(a)), entry of the proposed Amended Final Judgment has no *prima facie* effect in any subsequent private lawsuit that may be brought against United or Pacificare.

V.

PROCEDURES AVAILABLE FOR MODIFICATION
OF THE PROPOSED AMENDED FINAL JUDGMENT

The parties have stipulated that the proposed Amended Final Judgment may be entered by the Court after compliance with the provisions of the APPA, provided that the plaintiff has not withdrawn its consent. The APPA conditions entry upon the Court's determination that the proposed Amended Final Judgment is in the public interest.

The APPA provides a period of at least sixty (60) days preceding the effective date of the proposed Amended Final Judgment within which any person may submit to the United States written comments regarding the proposed Amended Final Judgment. Any person who wishes to comment should do so within sixty (60) days of the date this Competitive Impact Statement is published in the Federal Register. All comments received during this period will be considered by the Department of Justice, which remains free to withdraw its consent to the proposed Amended Final Judgment at any time prior to the Court's entry of judgment. The comments and the response of the United States will be filed with the Court and published in the Federal Register.

Written comments should be submitted to:

> Mark J. Botti
> Chief, Litigation I Section
> Antitrust Division
> U.S. Department of Justice
> 1401 H St. NW, Suite 4000
> Washington, DC 20530

The proposed Amended Final Judgment provides that the Court will retain jurisdiction over this action and that the parties may apply to the Court for any order necessary or appropriate for the modification, interpretation, or enforcement of the Amended Final Judgment.

VI.

ALTERNATIVES TO THE PROPOSED AMENDED FINAL JUDGMENT

The Department considered, as an alternative to the proposed Final Judgment, a full trial on the merits of the Complaint against the defendants. The United States could have continued the litigation and sought preliminary and permanent injunctions against United's acquisition of PacifiCare. The Department is satisfied, however, that the divestitures of the assets and other relief contained in the proposed Amended Final Judgment will preserve viable competition in the relevant markets alleged in the Complaint.

16

VII.

STANDARD OF REVIEW UNDER THE APPA FOR
PROPOSED AMENDED FINAL JUDGMENT

The APPA requires that proposed consent judgments in antitrust cases brought by the

United States be subject to a sixty (60)-day comment period, after which the Court shall

determine whether entry of the proposed Amended Final Judgment "is in the public interest." 15

U.S.C. § 16(e)(1). In making that determination, the Court shall consider:

A.  the competitive impact of such judgment, including termination of alleged
    violations, provisions for enforcement and modification, duration of relief sought,
    anticipated effects of alternative remedies actually considered, whether its terms
    are ambiguous, and any other competitive considerations bearing upon the
    adequacy of such judgment that the court deems necessary to a determination of
    whether the consent judgment is in the public interest; and

B.  the impact of entry of such judgment upon competition in the relevant market or
    markets, upon the public generally and individuals alleging specific injury from
    the violations set forth in the complaint including consideration of the public
    benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e)(1).

As the United States Court of Appeals for the District of Columbia Circuit has held, the

APPA permits a court to consider, among other things, the relationship between the remedy

secured and the specific allegations set forth in the government's complaint, whether the consent

judgment is sufficiently clear, whether enforcement mechanisms are sufficient, and whether the

consent judgment may positively harm third parties. See United States v. Microsoft Corp., 56

F.3d 1448, 1458-62 (D.C. Cir. 1995).

17

"Nothing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene." 15 U.S.C. § 16(e)(2). Thus, in conducting this inquiry, "[t]he court is nowhere compelled to go to trial or to engage in extended proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement through the consent decree process." 119 Cong. Rec. 24,598 (1973) (statement of Senator Tunney). Rather,

> [a]bsent a showing of corrupt failure of the government to discharge its duty, the Court, in making its public interest finding, should . . . carefully consider the explanations of the government in the competitive impact statement and its responses to comments in order to determine whether those explanations are reasonable under the circumstances.

United States v. Mid-America Dairymen, Inc., 1977-1 Trade Cas. (CCH) ¶ 61,508, at 71,980 (W.D. Mo. 1977).

Accordingly, with respect to the adequacy of the relief secured by the proposed Amended Final Judgment, a court may not "engage in an unrestricted evaluation of what relief would best serve the public." United States v. BNS Inc., 858 F.2d 456, 462 (9th Cir. 1988) (citing United States v. Bechtel Corp., 648 F.2d 660, 666 (9th Cir. 1981)); see also Microsoft, 56 F.3d at 1460-62. The law requires that:

> [t]he balancing of competing social and political interests affected by a proposed antitrust consent decree must be left, in the first instance, to the discretion of the Attorney General. The court's role in protecting the public interest is one of insuring that the government has not breached its duty to the public in consenting to the decree. The court is required to determine not whether a particular decree is the one that will best serve society, but whether the settlement is "*within the reaches of the public interest.*" More elaborate requirements might undermine the effectiveness of antitrust enforcement by consent decree.

18

Bechtel, 648 F.2d at 666 (emphasis added) (citations omitted).

A proposed final judgment, therefore, need not eliminate every anticompetitive effect of a particular practice, nor guarantee free competition in the future.  Court approval of a final judgment requires a standard more flexible and less strict than the standard required for a finding of liability: "[A] proposed decree must be approved even if it falls short of the remedy the court would impose on its own, as long as it falls within the range of acceptability or is 'within the reaches of public interest.'"  United States v. AT&T Corp., 552 F. Supp. 131, 151 (D.D.C. 1982) (citations omitted) (quoting Gillette, 406 F. Supp. at 716), aff'd sub nom. Maryland v. United States, 460 U.S. 1001 (1983); see also United States v. Alcan Aluminum Ltd., 605 F. Supp. 619, 622 (W.D. Ky. 1985) (approving the consent judgment even though the court would have imposed a greater remedy).

Moreover, the Court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its Complaint, and does not authorize the Court to "construct [its] own hypothetical case and then evaluate the decree against that case."  Microsoft, 56 F.3d at 1459.  Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by brinding a case in the first place," it follows that "the court is only authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire into other matters that the United States did not pursue.  Id. at 1459-60.

The proposed Amended Final Judgment here offers strong and effective relief that fully addresses the competitive harm posed by the transaction.

VIII.

DETERMINATIVE DOCUMENTS

There are no determinative materials or documents of the type described in Section 2(b) of

the APPA, 15 U.S.C. § 16(b), that were considered by the United States in formulating the

proposed Amended Final Judgment.

Dated: March 3, 2006

<div style="margin-left:40%;">

Respectfully Submitted,

_NICOLE S. GORDON_ (signature)

NICOLE S. GORDON
JON B. JACOBS (DC Bar #412249)
RICHARD MARTIN
STEVEN BRODSKY
PAUL TORZILLI
Attorneys
Litigation I Section
Antitrust Division
United States Department of Justice
City Center Building
1401 H Street NW, Suite 4000
Washington, D.C. 20530
(p) 202.307.0001
(f) 202.307.5802

</div>

CERTIFICATE OF SERVICE

I hereby certify that on March 3, 2006, I caused the foregoing to be electronically filed with the Clerk of the Court by using the Electronic Case Filing System, which will send a notice of electronic filing to:

Laura A. Wilkinson
Weil, Gotshal & Manges LLP
1300 Eye Street N.W., Suite 900
Washington, DC 20005

I further certify that I sent the foregoing via electronic mail to:

Fiona Schaeffer
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153

NICOLE S. GORDON
Attorney
Litigation I Section
Antitrust Division
United States Department of Justice