# Attachment 1

# DEPARTMENT OF JUSTICE

## Antitrust Division

**United States v. UnitedHealth Group Incorporated & PacifiCare Health Systems, Inc.; Propoosed Final Judgment and Competitive Impact Statement**

Notice is hereby given, pursuant to the Antitrust Procedures and Penalties Act, 15 U.S.C. 16(b)–(h), that a Complaint, proposed Amended Final Judgment, and Competitive Impact Statement were filed with the United States District Court for the District of Columbia in *United States* v. *UnitedHealth Group Incorporated & PacifiCare Health Systems, Inc.,* Civ. Action No. 1:05CV02436. On December 20, 2005, the United States filed a Complaint alleging that United's acquisition of PacifiCare would violate Section 7 of the Clayton Act, 15 U.S.C. 18. A proposed Final Judgment, filed on the same day, requires United to divest certain health insurance contracts in Tucson, Arizona and Boulder, Colorado. It also enjoins United from continuing to exchange certain information with CareTrust Networks, a wholly owned subsidiary of Blue Shield of California and requires United to terminate its network rental agreement with CareTrust effective one year after entry of the Final Judgment. On March 2, 2006, an Amended Final Judgment was filed to permit United to add new members to the CareTrust network until July 5, 2006. A Competitive Impact Statement filed by the United States describes the Complaint, the proposed Amended Final Judgment, the industry, and the remedies available to private litigants who may have been injured by the alleged violation.

Copies of the Complaint, proposed Final Judgment and Competitive Impact Statement are available for inspection at the U.S. Department of Justice, Antitrust Division, 325 Seventh Street, NW., Suite 215, Washington, DC 20530 (telephone: 202–514–2481), on the Internet at *http://www.usdoj.gov/atr*, and at the Clerk's Office of the United States District Court for the District of Columbia. Copies of these materials may be obtained upon request and payment of a copying fee.

Public comment is invited within the statutory 60-day comment period. Such comments and responses thereto will be published in the **Federal Register** and filed with the Court. Comments should be directed to Mark Botti, Chief, Litigation I Section, Antitrust Division, U.S. Department of Justice, 1401 H Street, NW., Suite 4000, Washington, DC 20530 (telephone: 202–307–0001).

**Dorothy B. Fountain,**
*Deputy Director of Operations, Antitrust Division.*

## United States District Court for the District of Columbia

Case Number 1:05CV02436
Judge: Ricardo M. Urbina
Deck Type: Antitrust
Date Stamp: 12/20/2005

United States of America, 1401 H Street, NW., Suite 4000, Washington, DC 20036, Plaintiff, v. UnitedHealth Group Incorporated, 9900 Bren Road East, Minnetonka, MN 55343, PacifiCare Health Systems, Inc., 5995 Plaza Drive, Cypress, CA 90630, Defendants

### Complaint

The United States of America, acting under the direction of the Attorney General of the United States, brings this civil action to enjoin defendant UnitedHealth Group Incorporated ("United") from acquiring certain health insurance-related assets of its competitor, defendant PacifiCare Health Systems, Inc. ("PacifiCare"), in violation of section 7 of the Clayton Act, as amended, 15 U.S.C. 18.

1. United is one of the nation's largest health insurers, providing health and wellness insurance and other services to more than 55 million people nationwide. PacifiCare has approximately 13 million health insurance members in Arizona, California, Colorado, Nevada, Oklahoma, Oregon, Texas, and Washington.

2. United and PacifiCare offer a variety of commercial health insurance products, such as health maintenance organizations ("HMOs") and preferred provider organizations ("PPOs").

3. Small businesses, to help recruit and retain good workers, seek to offer health insurance benefits for their employees by sponsoring a commercial health insurance plan. Health insurance benefits are frequently one of the largest costs facing small businesses, who are thus very price sensitive in purchasing health insurance. Small businesses rely upon vigorous competition among commercial health insurers to keep prices affordable. Small businesses' options for providing health care benefits are often more limited than those available to other employers; in many markets, there are commercial health insurers selling health plans to larger employers that do not sell to small-group employers.

4. United and PacifiCare compete against one another in the sale of commercial health insurance plans to small-group employers in the Tucson, Arizona Metropolitan Statistical Area ("MSA"), where the sales of health insurance plans to all small-group employers is estimated to exceed $250 million. United's acquisition of PacifiCare will eliminate direct competition between them, and may permit United to increase prices and reduce the quality of commercial health insurance plans to small-group employers in Tucson.

5. In addition, United and PacifiCare purchase health care services from physicians and other providers for their employer members. United's acquisition of PacifiCare will eliminate direct competition between them in the purchase of physician services in Tucson, Arizona, and Boulder, Colorado, will consolidate their purchasing power, and may permit United to acquire physician services at lower rates. Such lower rates would likely to lead to a reduction in the quantity or a degradation in the quality of physician services provided to patients in those areas. Total annual expenditures for physician services is estimated to exceed $1.5 billion in the Tucson MSA and $375 million in the Boulder MSA.

6. In addition, PacifiCare competes directly with Blue Shied of California, both for the purchase of health care provider services and for the sale of commercial health insurance in the State of California. United rents the provider networks of CareTrust Networks, a wholly-owned subsidiary of Blue Shield of California. Under a network access agreement, United has access to certain information about the CareTrust networks and a power to confer with Blue Shield about United's product development to the extent it affects the CareTrust networks. As a result of this merger, United will compete directly with Blue Shield. The continuation of the United/CareTrust network access agreement in its current form after the merger may substantially reduce competition in the markets for the purchase of health care provider services and for sale of commercial health insurance in one or more MSAs in California. In these markets, billions of dollars are spent annually on both the purchase of commercial health insurance, and the provision of health care providers services for members of health care benefit plans.

### I. Jurisdiction and Venue

7. The United States files this Complaint pursuant to Sections 15 and 16 of the Clayton Act, as amended, 15 U.S.C. 25 and 26, to prevent and restrain

the defendants' violation of section 7 of the Clayton, as amended, 15 U.S.C. 18.

8. United and PacifiCare are engaged in interstate commerce, and their activities substantially affect interstate commerce.

The Court has subject matter jurisdiction over this action and jurisdiction over the parties pursuant to Section 12 of the Clayton Act, 15 U.S.C. 22, and 28 U.S.C. 1331 and 1337(a).

10. Venue is proper in this District under 15 U.S.C. 22 and 28 U.S.C. 1391(c), in that each of the defendants is a corporation that transacts business and is found in the District of Columbia.

## II. The Defendants

11. United is a corporation organized under the laws of Minnesota, and has its principal place of business in Minnetonka, Minnesota. United is one of the country's leading commercial health insurers, offering a variety of HMO, PPO, Point-of-Service ("POS"), Self-Directed Health Plans ("SDHP"), and other products. United contracts with over 460,000 physicians and other health care professionals, and 4,200 hospitals, nationwide. United reported in excess of $37 billion in revenues of 2004.

12. PacifiCare is a corporation organized under Delaware law. Its primary place of business is Cypress, California. PacifiCare offers group health insurance products, such as HMOs, PPOs, Exclusive Provider Organizations ("EPOs"), SDHP, and Medicare HMOs under the Secure Horizons name, throughout the United States, PacifiCare reported $12.2 billion in revenues for 2004.

## III. United Proposes to Merge with PacifiCare

13. United entered into an Agreement and Plan of Merger (the "Transaction") with PacifiCare dated July 6, 2005.

14. The Transaction provides that PacifiCare shall merger into United. PacifiCare shareholders will receive 1.1 shares of United stock, and $21.50 cash, for each PacifiCare share owned. The acquisition price is $8.15 billion, based on closing share prices for the day of the Transaction.

## IV. Violations Alleged

*Count 1: Anti-Competitive Effects in the Sale of Commercial Health Insurance to Small-Group Employers in Tucson, Arizona*

15. Plaintiff incorporated herein paragraphs 1–14.

A. Relevant Product Market

16. The relevant price market affected by the proposed Transaction is the sale of commercial health insurance to small-group employers. Commercial health insurers, brokers who assist employers in purchasing health plans, and state insurance commissions view the market for the sale of commercial health to small-group employers as distinct from the large-group employer market. Commercial health insurers, such as United and PacifiCare, employ staff dedicated to marketing and sales of commercial health insurance plans to small-group employers, and develop and implement separate strategic plans directed to such sales. Brokers frequently specialize in working with small-group employers. Many state insurance commissions, including Arizona's, have regulations applying exclusively to the sale of commercial health insurance to small employers. Arizona defines small employers as those having between 2–50 employees. Arizona regulations, for example, require that commercial health insurers selling to small employers guarantee basic group health insurance coverage. Arizona also limits the variance among premium rates that a commercial health insurer can charge to its small employer customers.

17. For some employers, an effective alternative to purchasing commercial health insurance is self-funding. An employer self-funds its health benefits when is assumes responsibility for paying the covered health care expenses incurred by employees or their families, minus any co-payment or co-insurance payment an employee may pay for a given health care service. Employers that self-fund their health benefit plans frequently retain a company to provide administrative services for the plan (known as "administrative services only" or "ASO"). Many commercial health insurance companies also sell ASO to self-funded employers.

18. Because most small employers do not have a sufficient employee population across which they can spread the financial risk, and do not have multiple locations to obtain geographic diversity for risk reduction, self-funding is not a viable option for them.

19. Smaller employers are substantially less likely to have dedicated benefit administrators. Smaller employers place principal reliance upon brokers to assist in various aspects of their sponsorship of a health benefit plan, such as plan design consultation, and assistance with the bidding process.

20. Commercial health insurance contracts typically renew annually. Small employers, through their brokers, will solicit competing bids from various commercial insurers. Bidding occurs on an employer-by-employer basis, with commercial health insurers able to conform their bids to the characteristics of the employer and its employee population. Because self-funding is not a viable option for most small employers, they have a substantial stake in competition among commercial health insurers to produce the best available plan at the most affordable price.

21. An insufficient number of small-group employers would drop sponsorship of commercial health insurance plans to make a small but significant price increase to all small-group employers unprofitable. Sale of commercial health insurance to small-group employers is a relevant product market, and a line of commerce under section 7 of the Clayton Act.

B. Relevant Geographic Market

22. Health care primarily occurs on an in-person basis. Employees seek relationships with physicians and other health care professionals and institutions that are located in the metropolitan area in which they live and work.

23. Commercial health insurers and brokers consider the area in and around Tucson, Arizona, to be a separate and distinct area for the sale of health plans to small-group employers.

24. The United States Department of Commerce has defined the area in and around Tucson, Arizona as a MSA. The Tucson MSA is comprised of Pima County.

25. An insufficient number of small-group employers would purchase commercial health insurance outside the Tucson MSA to make a small but significant price increase to all small-group employers in Tucson unprofitable. The Tucson MSA is a relevant geographic market, and a section of the country under Section 7 of the Clayton Act.

C. Effects of the Proposed Transaction

26. United and PacifiCare are among the principal competitors in the market for the sale of commercial health insurance to small-group employers in Tucson, and they are among each other's principal competitors. Besides United and PacifiCare, there are few other substantial competitors. Many small-group employers have only one, or in some cases two, additional competitive options.

27. United and PacifiCare are the second and third largest sellers of commercial health insurance to small-group employers in Tucson. United

currently has an approximate 16% share of the small-group employer commercial health insurance lives in Tucson; PacifiCare's market share is approximately 17%. If the proposed Transaction were consummated, United would have an approximate 33% share, roughly equal to the market share of the largest commercial health insurer in Tucson. The market for the sale of commercial health insurance to small-group employers in Tucson is highly concentrated. If the proposed Transaction were consummated, the Herfindahl-Hirschman Index ("HHI"), which is commonly employed in merger analysis and is defined and explained in *Appendix A* to this Complaint, would be greater than 2,500, and the change in the HHI resulting from the proposed Transaction would be in excess of 500.

28. The market shares of other competitors are substantially smaller than the shares of the top three firms. United and PacifiCare are consistently competitive bidders to retain and obtain small-group employer business.

29. PacifiCare is a particularly aggressive, low-price competitor in the small-group employer market in Tucson. These are important qualities to small-group employers, who are sensitive to price and particularly reliant on competition to keep health benefit plans affordable. Absent the proposed Transaction, PacifiCare would likely take small-group employer business away from United and other competitors in Tucson.

30. In Tucson, small-group employers and their employees benefit from competition between United and PacifiCare, through better products and lower prices. The proposed Transaction will eliminate this competition, and may permit United to increase price and reduce quality of commercial health insurance plans to small-group employers in Tucson. The effect of the proposed Transaction may be substantially to lessen competition in violation of Section 7 of the Clayton Act.

*Count 2: Anti-Competitive Effects in the Purchase of Physician Services in Tucson, Arizona, and Boulder, Colorado*

31. Plaintiff incorporates herein Paragraphs 1–14.

32. One component of a commercial health insurance product is its provider networks. Commercial health insurers contract with an array of health care professionals and facilities in the various locations in which they sell insurance products to form provider networks. Physicians offer discounts from their usual fee schedule in order to obtain access to a commercial health insurer's substantial volume of members in need of health care services.

A. Relevant Product Market

33. There are no purchasers to whom physicians can sell their services other than individual patients or the commercial and governmental health insurers that purchase physician services on behalf of their patients. A small but significant decrease in the price paid to physicians would not cause physicians to seek other purchasers of their services or to otherwise change their activities (away from providing physician services) in numbers sufficient to make such a price reduction unprofitable. Thus, the purchase of physician services is a relevant product market, and a line of commerce under Section 7 of the Clayton Act.

B. Relevant Geographic Markets

34. The patient preferences that result in localized geographic markets for the sale of commercial health insurance also produce local markets for the purchase of physician services. Physicians expend considerable efforts to build a practice in a particular geographic area. A physician cultivates relationships with patients, and gains referrals in large part through a favorable reputation among peer physicians and others in the community. These assets, which a physician compiles over time, are not easily transportable.

35. The number of physicians who would sell their services outside Boulder and Tucson, respectively (by relocation, attracting patients from outside the physician's home MSA, or otherwise), would not be sufficient to make a small but significant price decrease to all physicians in those MSAs unprofitable. Similarly, a reduction in the quantity or quality of physician services resulting from the price decrease would not prompt a sufficient number of patients to obtain physician services outside those areas to overcome such a price decrease. Thus, the Boulder MSA and Tucson MSA are relevant geographic markets, and sections of the country under Section 7 of the Clayton Act.

C. Effects of the Proposed Transaction

36. The contract rates and other terms that a physician can obtain from a commercial health insurer depend on the physician's ability to terminate (or credibly threaten to terminate) the relationship if the insurer demands lower rates or other disfavored contract terms. A physician's ability to terminate a relationship with a commercial health insurer depends on his or her ability to replace the amount of business lost from the termination, and the time it would take to do so. Failing to replace lost business expeditiously is costly.

37. Physicians have a limited ability to maintain the business of patients enrolled in a health plan once the physician terminates. Physicians could retain patients by encouraging them to switch to another health plan in which the physician participates. This is particularly difficult for patients employed by companies that sponsor only one plan because the patient would need to persuade the employer to sponsor an additional plan with the desired physician in the plan's network. Alternatively, the patient may remain in the plan, visiting the physician on an out-of-network basis. The patient would be faced with the prospect of higher out-of-pocket costs, either in the form of increased co-payments for use of an out-of-network physician, or by absorbing the full cost of the physician care.

38. The difficulty of timely replacing the business lost from terminating a plan increases as the plan's share of the physician's total practice increases. The difficulty is even greater where the insurer accounts for a large share of all physicians' business in a given locality because of the effect on referrals from other physicians.

39. In Tucson, the combined membership of United and PacifiCare would comprise a significant percentage of physician revenues. PacifiCare's membership in Tucson includes substantial commercial health insurance members and managed care Medicare enrollees, which are marketed under the name Secured Horizons. Many physicians and physician groups derive a substantial percentage of their revenue from PacifiCare's managed care Medicare plans.

40. In Boulder, PacifiCare's membership consists of a small number of very large accounts, the largest of which is its contract with the University of Colorado for the provision of commercial HMO coverage to approximately 6,000 members residing in the Boulder area (the "Boulder Contract"). The Boulder Contract alone constitutes nearly half of PacifiCare's entire commercial health insurance membership in Boulder. Thus, PacifiCare's strong bargaining position in physician negotiations results largely from the members it derives from the Boulder Contract.

41. As a result of the proposed Transaction, United will account for a large share of total payments to all physicians in the Boulder and Tucson areas, and a particularly large share of revenue, in excess of 35% in the Tucson

MSA and in excess of 30% in the Boulder MSA, for a substantial number of physicians in those areas. These revenue shares understate the importance to physicians of payments from commercial health insurance plans. The total payments made to physicians include revenue earned by treating patients covered by Medicare and Medicaid, which account for a substantial amount of revenue for many physicians. Physicians typically consider commercial health insurance business more profitable than Medicare and Medicaid business. Many physicians use their commercial health insurance business to compensate for the lower revenue earned from Medicare and Medicaid business.

42. The markets for the purchase of physician services in the Tucson and Boulder MSAs are highly concentrated. If the proposed Transaction were consummated, the HHI would exceed 1,800 for Tucson and Boulder, and the change in HHI resulting from the proposed Transaction would exceed 700 for Tucson and 400 for Boulder.

43. The proposed Transaction may enable United to pay lower rates for physician services in Tucson and Boulder, which would likely lead to a reduction in quantity or degradation in quality of physician services provided to patients in these areas. Thus, the effect of the Transaction may be substantially to lessen competition in violation of Section 7 of the Clayton Act.

*Count 3: Anti-Competitive Effects in the State of California*

44. Plaintiff incorporates herein paragraphs 1–14.

45. United Currently does not actively sell commercial health insurance in California. Its California membership consists of employees of large, national or regional employers that self-fund their health benefit plans and use United for ASO.

46. To serve its California-based commercial members, United does not contract with health care providers directly. Since July 2000, United has rented the provider networks of CareTrust Networks. Blue Shield of California, which owns CareTrust Networks, is one of the largest commercial health insurers in California, with substantial membership throughout the State. In exchange for access to the CareTrust provider networks, which permits United to remain a competitive option for large self-funded employers with California-based employees, United pays a substantial fee to Blue Shield.

47. Pursuant to the network access agreement between United and CareTrust, United has access to certain information about the CareTrust provider network. The two hold regular meetings to review provider contract negotiations and terminations, reimbursement and claims processing issues, and network development. Through these meetings, United has gained access to information about the discounts that CareTrust has negotiated with physicians, hospitals, and other health care providers throughout California. On occasion, United has also disclosed to CareTrust its plans to introduce new commercial health insurance products in California to ensure that those new products would not breach the terms of any CareTrust network provider contract.

48. PacifiCare is one of the largest health insurers in the State of California, with substantial membership in its commercial and Secure Horizons products throughout the State.

A. Relevant Product Markets

49. PacifiCare competes with Blue Shield of California to sell commercial health insurance to groups of all sizes. The sale of commercial health insurance comprises one or more relevant product markets and lines of commerce under Section 7 of the Clayton Act.

50. Similarly, PacifiCare competes with Blue Shield of California to acquire health care provider services. The purchase of health care provider services, such as physician and hospital services, comprises one or more relevant product markets, and lines of commerce under Section 7 of the Clayton Act.

B. Relevant Geographic Markets

51. PacifiCare and Blue Shield of California compete in several MSAs throughout the State of California both to sell commercial insurance and to purchase physician and hospital services. Thus, various MSAs within the State of California are relevant geographic markets, and sections of the country under Section 7 of the Clayton Act.

C. Effects of the Proposed Transaction

52. PacifiCare and Blue Shield of California are among each other's principal competitors for the sale of commercial health insurance, and for the purchase of physician and hospital services. In several areas, PacifiCare and Blue Shield account for a substantial percentage of the commercial health insurance business.

53. Under the proposed Transaction, United will acquire PacifiCare's California membership, and thereby become one of Blue Shield's principal competitors for the sale of commercial health insurance and the purchase of provider services. The CareTrust alliance requires that United and Blue Shield exchange information about provider discounts and United's new products. The alliance also creates opportunities and incentives for United and Blue Shield to coordinate their competitive activities and for each to discipline the other by, among other things, terminating the network access agreement in response to competitive actions. The proposed Transaction, in light of the CareTrust alliance, may reduce competition between United and Blue Shield following the merger. Thus, the effect of the Transaction may be substantially to lessen competition for the sale of commercial health insurance and the purchase of provider services in California in violation of Section 7 of the Clayton Act.

**V. Prayer for Relief**

54. To remedy the violations of Section 7 of the Clayton Act alleged herein, the United States requests that the Court:

(a) Adjudge the proposed Transaction to violate Clayton Act Section 7, as amended, 15 U.S.C. 18;

(b) permanently enjoin and restrain defendants from consummating the proposed Transaction, or from entering into or carrying out any agreement, understanding, or endeavor, the purpose of which would be to combine the health insurance businesses or assets of United and PacifiCare; and

(c) award to plaintiff its costs of this action and such other and further relief as may be appropriate and as the Court may deem equitable, just, and proper.

Dated: December 20, 2005.

For Plaintiff United States of America:

Thomas O. Barnett,
*Acting Assistant Attorney General, Antitrust Division.*

J. Bruce McDonald,
*Deputy Assistant Attorney General, Antitrust Division.*

Dorothy B. Fountain,
*Deputy Director of Operations, Antitrust Division.*

Mark J. Botti (D.C. Bar #416948),
*Chief, Litigation I Section, Antitrust Division.*

Joseph Miller,
*Assistant Chief, Litigation I Section, Antitrust Division.*

Jon B. Jacobs (D.C. Bar #412249), Steven Brodsky, Richard S. Martin, Paul J. Torzilli, Nicole S. Gordon.
*Litigation I Section, Antitrust Division,* United States Department of Justice,

City Center Building, 1401 H Street, NW., Suite 4000, Washington, DC 20530, (p) 202-514-8349, (f) 202-307-5802.

**APPENDIX A—Herfindahl-Hirschman Index**

"HHI" means the Herfindahl-Hirschman Index, a commonly accepted measure of market concentration. It is calculated by squaring the market share of each share of each firm, competing in the market and then summing the resulting numbers. For example, for a market consisting of four firms with shares of 30, 30, 20, and 20 percent, the HHI is 2600 ($30^2 + 30^2 + 20^2 + 20^2 = 2600$). (**Note:** Throughout the Complaint, market share percentages have been rounded to the nearest whole number, but HHIs have been estimated using unrounded percentages in order to accurately reflect the concentration of the various markets.) The HHI takes into account the relative size distribution of the firms in a market and approaches zero when a market consists of a large number of small firms. The HHI increases both as the number of firms in the market decreases and as the disparity in size between those firms increases.

Markets in which the HHI is between 1000 and 1800 points are considered to be moderately concentrated, and those in which the HHI is in excess of 1800 points are considered to be highly concentrated. *See Horizontal Merger Guidelines* ¶ 1.51 (revised Apr. 8, 1997). Transactions that increase the HHI by more than 100 points in concentrated markets presumptively raise antitrust concerns under the guidelines issued by the U.S. Department of Justice and Federal Trade Commission. *See id.*

Filed: March 2, 2006.

**Amended Final Judgment**

*Whereas,* plaintiff, United States of America, filed its Complaint on December 19, 2005, plaintiff and defendants, defendant UnitedHealth Group Incorporated and defendant PacifiCare Health Systems, Inc., by their respective attorneys, have consented to the entry of this Final Judgment without trial or adjudication of any issue of fact or law and without this Final Judgment constituting any evidence against or admission by any party regarding any issue of fact or law;

*And Whereas,* defendants agree to be bound by the provisions of this Final Judgment pending its approval by the Court;

*And Whereas,* the essence of this Final Judgment is the prompt and certain Divestiture of certain rights or assets by defendants, and their adherence to certain injunctions, to ensure that competition is not substantially lessened;

*And Whereas,* plaintiff requires defendants to make certain Divestitures for the purpose of remedying the loss of competition alleged in the Complaint;

*And whereas,* defendants have represented to the United States that the Divestitures required by this Final Judgment can and will be made, and that defendants will later raise no claim of hardship or difficulty as grounds for asking the Court to modify any of the Divestiture or injunctive provisions contained herein;

*Now therefore,* before any testimony is taken, without trial or adjudication of any issue of fact or law, and upon consent of the parties, it is *ordered, adjudged, and decreed:*

**I. Jurisdiction**

This Court has jurisdiction over the subject matter of, and each of the parties to, this action. The Complaint states a claim upon which relief may be granted against defendants under Section 7 of the Clayton Act, as amended, 15 U.S.C. 18.

**II. Definitions**

As used in this Final Judgment:

A. "Boulder" means the Metropolitan Statistical Area comprising Boulder County, Colorado.

B. "Boulder Contract" means that portion of PacifiCare's current contract with the Regents of the University of Colorado, effective January 1, 2004, which covers the commercial HMO insurance of approximately six thousand and sixty-six (6,066) members as of June 30, 2005 resident in Boulder.

C. "Commercial Health Insurance Products" means United or PacifiCare products for comprehensive commercial health coverage (whether Administrative Services Only ("ASO") or fully insured) including, but not limited to: (1) Health Maintenance Organization ("HMO") group products; (2) Preferred Provider Organization ("PPO") group products; (3) Point-of-Service ("POS") group products; (4) indemnity insurance group products; and (5) Exclusive Provider Organization ("EPO") group products, but does not include Medicare Health Insurance Products.

D. "CTN" means CareTrust Networks, formerly known as California Physicians' Service Agency, Inc. ("CPSA"), a California business corporation that operates the CTN network in California, its successors and assigns, and its parent, subsidiaries, divisions, groups, affiliates, partnerships, and their respective directors, officers, managers, agents, and employees.

E. "Divestiture," "Divest" or "Divesting" means the sale, transfer, ceding, assignment or disposition of the beneficial interest in a contract or policy for health care coverage included in the Divestiture Assets by commercially reasonable means in accordance with applicable law.

F. "Divestiture Assets" means the Tucson Commercial Insurance Contracts and the Boulder Contract, and may also include copies of all relevant contracts, business records, data and information that specifically relate to the Divestiture Assets, but excluding defendants' proprietary assets and know-how used for general application in defendants' businesses.

G. "Legacy United Customers" means existing or new customers that have, prior to the closing of the Transaction, committed to purchase or been issued a quote for health care services from United using the CTN network in California.

H. "Transition United Customers" means any customers that have, after the closing of the Transaction, received a quote for health care services from United under a policy that has an effective date of July 5, 2006 or earlier. Such customers and their members may access the CTN network until no later than July 5, 2006.

1. "Medicare Health Insurance Product" means any plan, whether HMO, PPO, fee-for-service or other, providing managed care Medicare coverage under any of the following: Medicare Part B, Medicare Advantage, Medicare Cost Plans, or the Programs of All inclusive Care (PACE).

J. "PacifiCare" means defendant PacifiCare Health Systems, Inc., a Delaware corporation with its headquarters in Cypress, California, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and their respective directors, officers, managers, agents, and employees.

K. "Purchaser" or "Purchasers" means the entity or entities to whom the Divestiture Assets are Divested.

L. "Transaction" means the merger contemplated by the Agreement and Plan of Merger dated July 6, 2005, by and among United, Point Acquisition LLC and PacifiCare.

M. "Tucson" means the Metropolitan Statistical Area consisting of Pima County, Arizona.

N. "Tucson Commercial Insurance Contracts" means contracts or policies identified by United for the provision of any Commercial Health Insurance Products covering at least fifty-four thousand five hundred and seventeen (54,514) members who reside or work in Tucson, representing the total number of residents commercially insured members in Tucson that PacifiCare reported as of June 30, 2005. Such contracts include contracts identified by

United covering at least 7,581 members that obtain health coverage under United or PacifiCare contracts for Commercial Health Insurance Products with small group employers (2–50 employees) situated in Tucson ("Tucson Small Group Employers"), such 7,581 members representing the total number of resident Tucson Small Group Employer members that PacifiCare reported as of June 30, 2005. Such contracts may otherwise include contracts identified by United for any Commercial Health Insurance Products entered into by PacifiCare or United.

O. "United" means defendant UnitedHealth Group Incorporated, a Minnesota corporation with its headquarters in Minnetonka, Minnesota, its successors and assigns, and its subsidiaries, divisions, group, affiliates, partnerships and joint ventures, and their respective directors, officers, managers, agents, and employees.

### III. Applicability

A. This Final Judgment applies to Pacificare and United, as defined above, and to all other persons in active concert or participation with any of them who receive actual notice of this Final Judgment by personal service or otherwise.

B. Defendants shall require, as a condition of the sale or other disposition of all or substantially all of their assets or of lesser business units that include either the Divestiture Assets or any rights under United's network access agreement with CareTrust Networks, that the acquirer agrees to be bound by the provisions of this Final Judgment. Defendants however, need not obtain such an agreement from any Purchaser of the Divested Assets.

### IV. Divestitures

A. Defendants are hereby ordered and directed to Divest the Divestiture Assets in a manner consistent with this Final Judgment to one or more Purchasers acceptable to the United States, in its sole discretion, within: (i) one hundred and twenty (120) calendar days after the date on which the Transaction closes; or (ii) within five (5) days after notice of the entry of this Final Judgment by the Court, whichever is later. If approval or consent from any government unit is necessary with respect to Divestiture of the Divestiture Assets by defendants or the Divestiture Trustee, and if applications or requests for approval or consent have been filed with the appropriate governmental unit within one hundred and twenty (120) calendar days after the date on which the Transaction closes, but an order or other dispositive action on such applications has not been issued before the end of the period permitted for Divestiture, the period shall be extended with respect to Divestiture of those Divestiture Assets for which governmental approval or consent has not been issued until five (5) business days after such approval or consent is received.

B. The United States, in its sole discretion, may agree to one or more extensions of this time period not to exceed sixty-five (65) days total and shall notify the Court in such circumstances. Defendants agree to use their best efforts to Divest the Divestiture Assets as expeditiously as possible.

C. In accomplishing the Divestitures ordered by this Final Judgment, defendants promptly shall make know, by usual and customary means, the availability of the Divestiture Assets. Defendants shall inform any person making an inquiry regarding a possible purchase that the Divestiture is being made pursuant to this Final Judgment and shall provide such person with a copy of this Final Judgment. Defendants shall offer to furnish to all prospective Purchasers, subject to reasonable confidentiality assurances, all information and documents relating to the Divestiture Assets customarily provided in a due diligence process, except information and documents subject to the attorney-client privilege or the attorney work-product privilege. Defendants shall make available such non-privileged information to the United States at the same time that such information is made available to prospective Purchasers.

D. Defendants shall permit prospective Purchasers of the Divestiture Assets to have reasonable access to personnel and access to any and all financial, operational, or other documents and information as is customarily provided as part of a due diligence process for a transaction of this type.

E. Defendants shall provide to prospective Purchasers, and to the United States, information relating to the personnel in the sales and account management of the Divestiture Assets to enable such Purchasers to make offers of employment to those persons. Prior to Divestiture, defendants shall not interfere with any negotiations by any Purchasers to employ any such persons. For a period of one year from the date of the completion of each Divestiture, defendants shall not hire or solicit to hire any such person who was hired by any Purchasers, unless such individual has (1) a written offer of employment from a third party in such capacity or (2) a written notice from such Purchaser stating that the Purchaser does not intend to continue to employ the individual in such capacity.

F. Defendants shall warrant to all Purchaser(s) that the contracts included in the Divestiture Assets are in full force and effect on the date that binding agreements for the Divestiture are signed.

G. Defendants shall use their best efforts to Divest the Divestiture Assets and procure any consents and approvals required for such Divestitures.

H. Pursuant to a transition services agreement on customary commercial terms and conditions and approved by the United States, at the Purchaser's request, defendants will provide certain transitional support services for the Divestiture Assets for a period of time not to exceed eighteen (18) months from the date of Divestiture. These services may include claims processing, computer operations support, eligibility, enrollment, utilization management and run-out administration and such other services as are reasonably necessary to operate the Divestiture Assets.

I. Unless the United States otherwise consents in writing, the Divestiture pursuant to Section IV, or by trustee appointed pursuant to Section V, shall include the entire Divestiture Assets and shall be accomplished in such a way as to satisfy the United States, in its sole discretion, that the Divestiture Assets can and will be used by the Purchaser(s) as part of a viable, ongoing business engaged in the sale of Commercial Health Insurance Products. The Divestiture of the Divestiture Assets may be made to one or more Purchasers, provided that in each instance it is demonstrated to the sole satisfaction of the United States that the Divestiture Assets will remain viable and the Divestitures will remedy the competitive harm alleged in the Complaint. The Divestitures, whether pursuant to Section IV or Section V of this Final Judgment: (1) Shall be made to Purchaser(s) that, in the United States's sole judgment, each have the intent and capability (including the necessary managerial, operational, technical, and financial capability) to compete effectively in the sale of Commercial Health Insurance Products; and (2) shall be accomplished so as to satisfy the United States, in its sole discretion, that none of the terms of any agreement between defendants and any Purchaser gives defendants the ability to interfere with the Purchaser's ability to compete effectively.

J. If, before defendants can Divest the Boulder Contract, the University of Colorado has terminated its entire

contract with PacifiCare for commercial HMO insurance or the portion thereof that relates to the Boulder membership as defined in this Final Judgment and has awarded that entire contract or the Boulder portion to a Commercial Health Insurance plan other than United or PacifiCare, then defendants shall not be required to Divest the Boulder Contract or any other contracts or assets in the Boulder MSA. If the University of Colorado has not terminated the contract entirely or the Boulder portion but, in the United State's sole discretion, Divesting the Boulder Contract as it is defined in this Final Judgment would be unreasonably disruptive to the University of Colorado, then defendants shall instead be required to Divest contracts identified by United covering at least, 6,066 members who reside or work in Boulder and who obtain health coverage under United or PacifiCare contracts for Commercial Health Insurance Products.

## V. Appointment of Trustee

A. If defendants have not Divested the Divestiture Assets within the time period specified in Section IV, defendants shall notify the United States of that fact in writing. Upon application of the United States, the Court shall appoint a trustee selected by the United States and approved by the Court to effect the Divestiture of any of the Divestiture Assets not already Divested or subject to a binding Divestiture agreement.

B. After the appointment of a trustee becomes effective, only the trustee shall have the right to Divest the Divestiture Assets. The trustee shall have the power and authority to accomplish the Divestitures to Purchaser(s) acceptable to the United States: (1) At such price and on such terms as are then obtainable upon reasonable effort by the trustee, subject to the provisions of Sections IV, V, and VI of this Final Judgment; (2) subject to Section V.C below, by hiring at the cost and expense of defendants any investment bankers, attorneys, or other agents, who shall be solely accountable to the trustee, reasonably necessary in the trustee's judgment to assist in the Divestitures; and (3) with such other powers as the Court deems appropriate.

C. Defendants shall not object to any Divestiture by the trustee on any ground other than the trustee's malfeasance. Any such objections by defendants must be conveyed in writing to the United States and the trustee within ten (10) calendar days after the trustee has provided the notice required under Section VI.

D. The trustee shall serve at the cost and expense of defendants, on such terms and conditions as the United States approves, and shall account for all monies derived from the sale of the Divestiture Assets sold by the trustee and for all costs and expenses so incurred. After approval by the Court of the trustee's accounting, including fees for its services and those of any professionals and agents retained by the trustee, all remaining money shall be paid to defendants and the trust shall then be terminated. The compensation of the trustee and any professionals and agents retained by the trustee shall be reasonable in light of the value of the Divestiture Assets and based on a fee arrangement providing the trustee with an incentive based on the price and terms of the Divestitures and the speed with which they are accomplished, but timeliness is paramount.

E. Defendants shall use their best efforts to assist the trustee in accomplishing the required Divestitures, including best efforts to effect all necessary regulatory approvals and consents. The trustee and any consultants, accountants, attorneys, and other persons retained by the trustee shall have full and complete access to the personnel, books, and records that relate to the Divestiture Assets, and defendants shall develop financial or other information relevant to the Divestiture Assets as the trustee may reasonably request, subject to customary confidentiality assurances.

F. After its appointment, the trustee shall file monthly reports with the United States and the Court setting forth the trustee's efforts to accomplish the Divestitures ordered under this Final Judgment; provided, however, that to the extent such reports contain information that the trustee deems confidential, such reports shall not be filed in the public docket of the Court. Such reports shall include the name, address and telephone number of each person who, during the preceding month, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring, any interest in the Divestiture Assets, and shall describe in detail each contact with any such person. The trustee shall maintain full records of all efforts made to Divest the Divestiture Assets.

G. If the trustee has not accomplished such Divestitures within six (6) months after its appointment, the trustee thereupon shall file promptly with the Court a report setting forth (1) the trustee's efforts to accomplish the required Divestitures; (2) the reasons, in the trustee's judgment, why the required Divestitures have not been accomplished; and (3) the trustee;s recommendations; provided, however, that to the extent such reports contain information that the trustee deems confidential, such reports shall not be filed in the public docket of the Court. The trustee shall at the same time furnish such report to the United States, who shall have the right to be heard and to make additional recommendations consistent with the purpose of the trust. The Court shall enter thereafter such orders as it shall deem appropriate in order to carry out the purpose of this Final Judgment which may, if necessary, include extending the trust and the term of the trustee's appointment by a period requested by the United States.

## VI. Notice of Proposed Divestitures

A. Within two (2) business days following a execution of a definitive Divestiture agreement, contingent upon compliance with the terms of this Final Judgment, to effect, in whole or in part, any proposed Divestitures pursuant to Section IV or Section V of this Final Judgment, defendants or the trustee, whichever is then responsible for effecting the Divestitures, shall notify the United States of the proposed Divestitures. If the trustee is responsible, it shall similarly notify defendants. The notice shall set forth the details of the proposed Divestiture and list the name, address, and telephone number of each person not previously identified who offered to, or expressed an interest in or a desire to, acquire any ownership interest in the Divestiture Assets that is the subject of the binding contract, together with full details of same.

B. Within fifteen (15) calendar days of its receipt of such notice, the United States may request from defendants, the trustee, the proposed Purchaser(s), or any other third party additional information concerning the proposed Divestitures, the proposed Purchaser(s), and any other potential Purchaser(s). Defendants and the trustee shall furnish any additional relevant information requested from them promptly, and in all events within fifteen (15) calendar days of the receipt of the request, unless the parties shall otherwise agree.

C. Within thirty (30) calendar days after receipt of the notice or within twenty (20) calendar days after the United States has been provided the additional information requested from defendants, the trustee, the proposed Purchaser(s), and any third party, whichever is later, the United States shall provide written notice to defendants and the trustee, if there is

one, stating whether it objects to the proposed Divestitures. If the United States provides written notice to defendants and the trustee that it does not object, then the Divestitures may be consummated, subject only to defendants' limited right to object to the Divestiture under Section V.C of this Final Judgment. Absent written notice that the United States does not object to the proposed Purchaser(s) or upon objection by the United States, such Divestitures proposed under Section IV or Section V shall not be consummated. Upon objection by defendants under Section V.C, a Divestiture proposed under Section V shall not be consummated unless approved by the Court.

### VII. Injunctive Provisions

A. Effective one (1) year after the entry of this Final Judgment, United shall discontinue renting the CTN provider network in the State of California and shall not rent the CTN provider network for the period of the Final Judgment.

B. Effective upon the closing of the Transaction, United shall not:

(1) Communicate with CTN in any regarding the introduction of new United or CTN Commerical Health Insurance Products, in California or elsewhere;

(2) Permit any United customer, other than a Legacy United Customer or a Transition United Customer, to access the CTN network, except that such access by a Transition United Customer shall cease on or before July 5, 2006;

(3) Have any involvement with CTN relating to negotiations over rates or other terms with any physician or hospital in any provider network;

(4) Have any involvement with CTN relating to the development of any provider network;

(5) Exchange with CTN any non-public information (including, but not limited to, information relating to PacifiCare's network or the sale or marketing of Commercial Health Insurance Products) that is not necessary for United's rental of provider services from or access by Legacy United Customers or Transition United Customers to CTN's network;

(6) Engage in any joint efforts with CTN to sell or market Commercial Health Insurance Products.

This Section VII.B shall not affect CTN's existing network maintenance and network standards obligations and any other existing CTN obligations to United with respect to providers in the CTN network.

C. United shall develop and enact procedures to ensure, during the time period in which it continues to rent CTN's network in California, that any non-public information obtained from CTN about CTN's network, or any other provider network, is not disseminated to persons other than those with a legitimate need for it. Such procedures shall ensure that:

(1) Any non-public information obtained from CTN about CTN's network is not disseminated to any United employee who has responsibility for either: (a) Negotiating with physicians or hospitals in any provider network; or (b) selling Commercial Health Insurance Products to any customer other than a Legacy United Customer or a Transition United Customer;

(2) Any non-public information about PacifiCare's network that is not necessary for United's rental or provider services from or access by Legacy United Customers or Transition United Customers to CTN's network is not disseminated to any CTN employee; and

(3) Neither United nor CTN has any involvement in the marketing or sale of Commercial Health Insurance Products by the other.

D. Within ten (10) business days of the entry of the Final Judgment, United shall submit to the United States a document setting forth in detail its proposed plan for complying with the injunctions in this Section VII. The United States shall have the sole discretion to approve or disapprove United's proposed compliance plan, and shall notify United within five (5) business days of its decision. If United's proposal is rejected, the United States shall state its reasons for doing so, and United shall be given the opportunity to submit, within five (5) business days of receiving the notice of rejection, a revised compliance plan.

E. From the closing of the Transaction, United shall not require any physician practicing in Tucson, as a condition for participating in any of United's networks for its Commercial Health Insurance Products, to agree to participate in United's network for any Medicare Health Insurance Product. Similarly, United shall not require any physician practicing in Tucson, as a condition for participating in United's network for any Medicare Health Insurance Product, to agree to participate in any of United's networks for its Commercial Health Insurance Products. United may, however, permit any physician who wants, and voluntarily agrees, to participate in one or more of its networks to do so without violating this Final Judgment. This provision does not apply to (i) contracts entered into by United or PacifiCare prior to the closing of the Transaction that provide for participation in both Commercial Health Insurance Products and Medicare Health Insurance Products; or (ii) any contractual provision that obliges physicians to participate with respect to all Commercial Health Insurance Products of either defendant.

### VIII. Affidavits

A. Within twenty (20) calendar days of the filing of the Complaint in this matter and every thirty (30) calendar days thereafter until the Divestitures and other remedies set forth herein have been completed, whether pursuant to Section IV or Section V, defendants shall deliver to the United States an affidavit as to the fact and manner of compliance with Section IV or Section V of this Final Judgment. Each such affidavit shall include the name, address, and telephone number of each person who, during the preceding thirty days, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring any interest in the Divestiture Assets, and shall describe in detail each contact with any such person during that period. Each such affidavit shall also include a description of the efforts that defendants have made to solicit a Purchaser(s) for the Divestiture Assets and to provide required information to prospective Purchasers including the limitations, if any, on such information. Assuming the information set forth in the affidavit is true and complete, any objection by the United States to information provided by defendants, including limitations on the information, shall be made within fourteen (14) calendar days of receipt of such affidavit.

B. Within twenty (20) calendar days of the filing of the Complaint in this matter, defendants shall deliver to the United States an affidavit that describes in reasonable detail all actions defendants have taken and all steps defendants have implemented on an ongoing basis to comply with Section IX of this Final Judgment. The affidavit also shall describe, but not be limited to, defendants' efforts to maintain and operate the Divestiture Assets. Defendants shall deliver to the United States an affidavit describing any changes to the efforts and actions outlined in defendants' earlier affidavits filed pursuant to this Section within fifteen (15) calendar days after the change is implemented.

C. Until one (1) year after the Divestitures required by this Final Judgment have been completed,

defendants shall preserve all records of all efforts made to preserve the Divestiture Assets and effect the Divestitures.

### IX. Preservation of Assets

Until the Divestitures required by the Final Judgment have been accomplished, defendants shall: (1) Preserve and maintain the value and goodwill of the Divestiture Assets; (2) operate the Divestiture Assets in the ordinary course of business; and (3) take no action that would jeopardize, delay, or impede the Divestiture of the Divestiture Assets.

### X. Financing

Defendants shall not finance all or any part of any Purchase made pursuant to Section IV or V of this Final Judgment.

### XI. Compliance Inspection

A. For the purposes of determining or securing compliance with this Final Judgment, or of determining whether the Final Judgment should be modified or vacated, and subject to any legally recognized privilege, from time to time duly authorized representatives of the United States Department of Justice, including consultants and other persons retained by the United States, shall, upon written request of a duly authorized representative of the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to defendants, be permitted:

(1) Access during defendants' office hours to inspect and copy, or at the United States's option, to require that defendants provide copies of, all books, ledgers, accounts, records and documents in the possession, custody, or control of defendants, relating to any matters contained in this Final Judgment; and

(2) To interview, either informally or on the record, defendants' officers, employees, or agents, who may have their individual counsel present, regarding such matters. The interviews shall be subject to the reasonable convenience of the interviewee and without restraint or interference by defendants.

B. Upon the written request of a duly authorized representative of the Assistant Attorney General in charge of the Antitrust Division, defendants shall submit written reports, or responses to written interrogatories, under oath if requested, relating to any of the matters contained in this Final Judgment as may be requested.

C. No information or documents obtained by the means provided in this section shall be divulged by the United States to any person other than an authorized representative of the executive branch of the United States, except in the course of legal proceedings to which the United States is a party (including grand jury proceedings), or for the purpose of securing compliance with this Final Judgment, or as otherwise required by law.

D. If at the time information or documents are furnished by defendants to the United States, defendants represent and identify in writing the material in any such information or documents to which a claim of protection may be asserted under Rule 26(c)(7) of the Federal Rules of Civil Procedure, and defendants mark each pertinent page of such material, "Subject to claim of protection under Rule 26(c)(7) of the Federal Rules of Civil Procedure," then the United States shall give defendants ten (10) calendar days notice prior to divulging such material in any legal proceeding (other than grand jury proceedings).

### XII. No Reacquisition

Defendants may not reacquire any of the Divestiture Assets during the term of this Final Judgment, provided, however, that nothing herein shall affect defendants' ability to bid or offer to provide health care coverage or services, including to employers and members covered by contracts or policies included in the Divestiture Assets.

### XIII. Retention of Jurisdiction

The Court retains jurisdiction to enable any party to this Final Judgment to apply to this Court at any time for further orders and directions as may be necessary or appropriate to carry out or construe this Final Judgment, to modify any of its provisions, to enforce compliance, and to punish violations of its provisions.

### XIV. Expiration of Final Judgment

Unless this Court grants an extension, this Final Judgment shall expire five (5) years from the date of its entry.

### XV. Public Interest Determination

The parties have complied with the requirements of the Antitrust Procedures and Penalties Act, 15 U.S.C. 16, including making copies available to the public of this Final Judgment, the Competitive Impact Statement, and any comments thereon and the United States' response to comments. Based upon the record before the Court, which includes the Competitive Impact Statement and any comments and response to comments filed with the Court, entry of this Final Judgment is in the public interest.

Dated:

---

*United States District Judge*

Filed: March 3, 2006.

United States of America, Plaintiff, v. UnitedHealth Group, Inc., and PacifiCare Health Systems, Inc., Defendants.

### Competitive Impact Statement

Pursuant to Section 2(b) of the Antitrust Procedures and Penalties Act ("APPA"), 15 U.S.C. 16(b)–(h), the United States submits this Competitive Impact Statement to assist the Court in assessing the proposed Amended Final Judgment submitted for entry in this civil antitrust proceeding.

### I. Nature and Purpose of This Proceeding

The United States filed a civil antitrust Complaint under section 15 of the Clayton Act, 15 U.S.C. 25, on December 20, 2005, alleging that the proposed acquisition by UnitedHealth Group, Inc. ("United") of PacifiCare Health Systems, Inc. ("PacifiCare") would violate section 7 of the Clayton Act ("Section 7"), 15 U.S.C. 18.

The Complaint alleges that the proposed acquisition may substantially lessen competition in the following markets: (i) The sale of commercial health insurance plans to small-group employers (those with 2–50 employees) in the Tucson, Arizona Metropolitan Statistical Area ("MSA"); (ii) the purchase of physician services in the Tucson MSA; (iii) the purchase of physician services in the Boulder, Colorado MSA; and (iv) the sale of commercial health insurance plans and the purchase of health care provider services in numerous MSAs throughout California.

When the Complaint was filed, the United States also filed a proposed settlement that would permit United to complete its acquisition of PacifiCare but would require divestitures of certain assets and injunctive relief sufficient to preserve competition in the sale of commercial health insurance to small-group insurers in Tucson, the purchase of physician services in Tucson and Boulder, and the sale of health insurance and purchase of physician and hospital services in California.

The United States filed a proposed Amended Final Judgment on March 2, 2006 which will allow United to offer in-network benefits to new members requiring medical care in the State of California pending completion of certain operational steps necessary for

United to transition to the PacifiCare network.

Plaintiff and Defendants have stipulated that the proposed Amended Final Judgment may be entered after compliance with the APPA. Entry of the proposed Amended Final Judgment would terminate this action, except that the Court would retain jurisdiction to construe, modify, or enforce the provisions of the proposed Amended Final Judgment and to punish violations thereof.

## II. The Alleged Violations

### A. The Defendants

United is a Minnesota corporation with its principal place of business in Minnetonka, Minnesota. It offers a variety of HMO, PPO, Point-of-Service ("POS") health plans Self-Directed Health Plans ("SDHP"), and other products. United also purchases physician services for its health plan members, which it offers to members through United's health plans. United is one of the leading health insurers in the United States and reported in excess of $37 billion in revenues for 2004.

PacifiCare is a Delaware corporation with its principal place of business in Cypress, California. Like United, PacifiCare offers group health insurance products, such as HMOs, PPOs, Exclusive Provider Organizations ("EPOs"), and SDHP, and also buys physician services, which it offers to its members through PacifiCare's health plans. PacifiCare reported $12.2 billion in revenues for 2004.

### B. The Acquisition

United entered into an Agreement and Plan of Merger ("Agreement") with PacifiCare dated July 6, 2005. Pursuant to the terms of the Agreement, PacifiCare merged into United on December 20, 2005, after the defendants received all of the necessary regulatory approvals. PacifiCare shareholders received 1.1 shares of United stock and $21.50 cash for each PacifiCare share owned.

### C. Anticompetitive Effects of the Acquisition

1. The Sale of Health Insurance to Small-Group Employers in the Tucson MSA

The Complaint alleges that United's proposed acquisition of PacifiCare is likely to substantially lessen competition in the sale of commercial health insurance to small-group employers in Tucson, Arizona in violation of section 7 of the Clayton Act.

a. The Sale of Commercial Health Insurance to Small-Group Employers Is a Relevant Product Market

Commercial health insurance companies, such as United and PacifiCare, contract with employers and other groups to provide health insurance services. The market for the sale of commercial health insurance to small-group employers is separate from the market for the sale of such insurance to larger groups.

Unlike larger-group employers, small-group employers cannot feasibly self fund their employees' health benefits. They do not have a sufficient employee population across which they can spread financial risk, nor do they typically have multiple locations that reduce risk through geographic diversity. Because self funding is not a viable option for small-group employers, they would not switch to self funding in sufficient numbers to make a small but significant increase in the price of fully-insured health plans to all small-group employers unprofitable.

The different markets are also evident in the ways that commercial health insurance is regulated, sold, and purchased. Many states have regulations that apply only to the sale of commercial health insurance to small-group employers. In Arizona, state law defines small employers as those having 2–50 employees, and certain statutes apply specifically to insurance sold to those groups. A.R.S. section 20–2301(A)(22). See, e.g., A.R.S. sections 20–2304, 20–2311.

The way in which commercial health insurance is sold also distinguishes the small and large group markets. Commercial health insurers, like United and PacifiCare, engage in extensive negotiations over price and other contract terms with large employers. These negotiations result in different large groups paying different prices for health plans from the same insurer. In contrast, commercial health plans conduct fewer and more limited negotiations with small-group employers. The insurer often sets the price at which it offers its health plans to small groups and those groups decide to accept or reject largely based on public information.

Because of these differences in the way that commercial health insurance is sold to large and small groups, health insurers employ staff dedicated solely to marketing and selling commercial health insurance plans to small-group employers, and develop and implement separate strategic plans for such customers. Rather than employ dedicated benefit administrators, small-group insurers are more likely to rely on brokers, who frequently specialize in working with small-group employers, to assist in various aspects of an employer's sponsorship of a health benefit plan, such as plan design consultation, and assistance with the bidding process.

Health insurers, brokers, state insurance commissions, and the purchasers themselves consider the small-group market to be separate and distinct.

b. The Tucson MSA Is a Relevant Geographic Market

Health insurance plan enrollees seek relationships with physicians and other health care professionals and institutions that are located in the metropolitan area in which they live and work. Commercial health insurers and brokers consider the area in and around Tucson, Arizona to be a separate and distinct area for the sale of health plans to small-group employers. The United States Department of Commerce has defined the area in and around Tucson, Arizona as an MSA.

c. Competitive Effects in the Market for the Sale of Commercial Health Insurance to Small-Group Employers in the Tucson MSA

Small-group employers rely on competition to keep health benefit plans affordable. Before the merger, small-group employers in Tucson could choose between United, PacifiCare, and one or two other options. PacifiCare was the low-price competitor in the market, an important consideration for small-group employers, which tend to be especially price-sensitive.

United and PacifiCare were the second and third largest sellers of commercial health insurance in Tucson. Market shares drop off substantially after the top three insurers. With few alternatives and no low-cost alternative, the merged entity would have been able to increase prices or reduce the quality of its health plans offered to small-group employers.

2. The Purchase of Physician Services in the Tucson and Boulder MSAs

United's acquisition of PacifiCare will also increase its purchasing power over physician services in the Tucson and Boulder MSAs, which would enable United to reduce the rates paid for those services.

a. The Purchase of Physician Services Is a Relevant Product Market

Physician services are those medical services provided and sold by physicians. The only purchasers of

these services are individual patients or commercial and government health insurers that purchase these services on behalf of individual patients. As a result, physicians cannot seek other purchasers in the event of a small but significant decrease in the prices paid by these buyers. Nor will such a price decrease cause physicians to stop providing their services or shift towards other activities in numbers sufficient to make such a price reduction unprofitable.

b. The Tucson and Boulder MSAs Are Relevant Geographic Markets

Like the sale of commercial health insurance, the market for physician services is local. Patients choose physicians in the metropolitan area in which they live and work. Physicians invest time and expense in building a practice and would incur costs in moving to a new geographic area. Therefore, a decrease in the rice paid to physicians in Tucson or Boulder would not cause physicians to relocate their practices in numbers sufficient to make such a price reduction unprofitable. The United States Department of Commerce has defined the areas in and around Tucson, Arizona and Boulder, Colorado as MSAs.

c. Competitive Effects in the Market for the Purchase of Physician Services in the Tucson and Boulder MSAs

The contract terms a physician can obtain from a commercial health insurance company like United depend on the physician's ability to terminate (or credibly threaten to terminate) the relationship if the company demands unfavorable contract terms. A physician's ability to terminate a relationship with a commercial health insurer depends on his or her ability to replace the amount of business lost from the terminated insurer's patients, and the time it would take to do so. Failing to replace lost business expeditiously is costly.

Physicians have only a limited ability to encourage patients to switch health plans. To retain a patient after terminating a plan requires the physician to convince patients to either switch to another employer-sponsored plan in which the physician participates or to pay considerably higher out-of-pocket costs, whether in the form of increased copayments for use of an out-of-network physician or by absorbing the total cost of the services. As a result, a physician who terminates his or her relationship with United, for example, could expect to lose a significant share of his or her United patients. The ability to make up the lost business is diminished when a physician's non-United sources of patients are more limited. Consequently, the cost of replacing United patients will be greater the larger United's share of all patients in an area.

United's acquisition of PacifiCare will give it control over both a large share of revenue of a substantial number of patients in Tucson and Boulder and a large share of all patients in those areas. Since physicians have a limited ability to encourage patient switching, the merger will significantly increase the number of physicians in Tucson and Boulder who are unable to reject United's demands for more adverse contract terms. Thus, the acquisition will give United the ability to unduly depress physician reimbursement rates in Tucson and Boulder, likely leading to a reduction in quantity or degradation in the quality of physician services.

3. The Sale of Commercial Health Insurance and the Purchase of Health Care Provider Services in California

Before its acquisition of PacifiCare, United did not actively sell commercial health insurance in California. Its California membership consisted of employees of large, national or regional employers that self-fund their health benefit plans and use United only for administrative services.

Since 2000, United has rented the provider networks of CareTrust Networks, a wholly-owned subsidiary of Blue Shield of California ("Blue Shield"), to serve its California-based commercial members. Blue Shield is one of the largest commercial health insurers in California, with substantial membership throughout the state. PacifiCare and Blue Shield are among each other's principal competitors for the sale of commercial health insurance and for the purchase of physician and hospital services. As a result of the transaction, United obtained PacifiCare's California membership and became one of Blue Shield's principal competitors for the sale of commercial health insurance and the purchase of provider services.

a. Relevant Product Markets and Geographic Markets in California

PacifiCare, and now United, competed with Blue Shield in the sale of commercial health insurance to groups of all sizes. Similarly, PacifiCare competed with Blue Shield to acquire health care provider services, from both physicians and hospitals, in MSAs throughout the state.

b. Competitive Effects in the Markets for the Sale of Commercial Health Insurance and the Purchase of Health Care Provider Services

United's acquisition of PacifiCare creates the potential for both coordinated and unilateral anticompetitive effects. Through its acquisition of PacifiCare, United assumed PacifiCare's place in the California markets for the sale of commercial health insurance and the purchase of healthcare provider services and thus became one of Blue Shield's most important competitors. United and Blue Shield will have access to highly sensitive competitive information about the other company, dramatically increasing each company's ability to coordinate prices charged for commercial health insurance and prices paid to health care providers. Similarly, the importance of this relationship may lead each company to be less aggressive when negotiating with employer groups or assembling provider networks.

Pursuant to the network access agreement between United and CareTrust, United has access to certain information about the CareTrust provider network (and thus about Blue Shield's provider network), including provider contract negotiations and terminations, reimbursement and claims processing issues, new commercial health insurance products, and network development. The network access agreement requires Blue Shield to give United 90 days' notice if it changes its fee schedules. Similarly, United must inform Blue Shield of the development of any new products. In addition, the network access agreement also ties United's hospital reimbursement levels to those of Blue Shield by requiring Blue Shield to use its best efforts to persuade hospitals to accept reimbursement levels at a certain percentage of Blue Shield's reimbursement levels.

III. Explanation of The Proposed Amended Final Judgment

The proposed Amended Final Judgment is designed to eliminate the anticompetitive effects identified in the Complaint by requiring United to divest certain commercial health insurance contracts in the Tucson and Boulder MSAs. It also requires United to stop exchanging certain information with CareTrust Networks in California and, one year after entry of the Amended Final Judgment, to discontinue renting the CareTrust provider network.

In Tucson, the proposed Amended Final Judgment requires United to identify and divest commercial health

insurance contracts covering at least 54,517 members who reside or work in the Tucson MSA. This is the total number of commercially insured members in Tucson that PacifiCare reported as of June 30, 2005. Although United has some discretion in determining which contracts to include in this divestiture package, it must include contracts covering at least 7,581 members covered by contracts with small-group employers—the number of Tucson-resident members covered under such small-group contracts that PacifiCare reported as of June 30. This divestiture addresses the competitive harms alleged in the Complaint by requiring United to divest enough small-group contracts to leave it with approximately the same market share of the small-group market, and the same number of commercially insured lives, that it had before acquiring PacifiCare.

The proposed Amended Final Judgment also prohibits United from requiring any physician practicing in the Tucson MSA, as a condition for participating in any of United's networks for its commercial health insurance products, to agree to participate in United's network for any Medicare health insurance product. Similarly, United will be prohibited from requiring Tucson physicians, as a condition for participating in any of its Medicare plans, to participate in any of its commercial health insurance plans. The prohibition against using this type of contractual requirement, commonly referred to as an "all-products" clause, was included in the proposed Judgment because a substantial percentage of PacifiCare's overall membership in Tucson was enrolled in its Medicare HMO plan marketed under the name Secure Horizons. Many physicians in Tucson derived a substantial percentage of their revenue from patients enrolled in this plan. This is relevant to the competitive effects in the market for the purchase of physician services because in calculating the percentage of a physician's revenue represented by United and PacifiCare, a physician's *total* revenue was taken into account— including from all commercial health plans, government programs such as Medicare and Medicaid, and private Medicare Advantage and Medicare HMO plans such as Secure Horizons. Without this injunction, United might have been able to use an all-products clause to force doctors in Tucson to participate in both its commercial and Medicare plans. Had it done so, United might have accounted for a much larger share of the total payments for many physician practices in Tucson. The

injunction against using such an all-products clause ensures that Tucson area doctors will be free to choose whether to participate in United's networks for its commercial plans, its networks for its Medicare plans, or both.

In Boulder, the proposed Amended Final Judgment requires United to divest either the 6,066 members residing in the Boulder MSA who are covered under PacifiCare's current HMO contract with the University of Colorado, or an equivalent number of Boulder-area members covered under other contracts. Unlike its Tucson membership, PacifiCare's membership in the Boulder MSA is concentrated in a smaller number of very large contracts. Its HMO contract with the University of Colorado is its largest contract in Boulder; the 6,066 members residing in Boulder who are covered under that contract account for nearly half of PacifiCare's total commercial membership in Boulder. Thus, PacifiCare's bargaining position in its negotiations with Boulder-area doctors would have been very different had it not had this HMO contract. Without that contract, PacifiCare's membership in Boulder would have been substantially less and United's acquisition of that much smaller membership would not have generated the same level of competitive concern that led the United States to challenge this transaction in the Boulder market. That, in addition to other facts relating to the insurance market in Boulder, led the United States to conclude that the divestiture of the 6,066 members covered under the University HMO contract (or the divestiture of an equivalent number of members covered under other contracts) will be sufficient to remedy the competitive harm alleged in the Complaint. Finally, an injunction against United using an all-products clause in Boulder was unnecessary because PacifiCare's SecureHorizons enrollment in Boulder constituted a significantly smaller percentage of its overall membership in Boulder compared to Tucson.

The divestitures in both Tucson and Boulder must be accomplished by selling or conveying the contracts to one or more purchasers that, in the sole discretion of the United States, will be viable, ongoing competitors in the relevant markets. The divestitures (i) shall be made to purchasers that each have the intent and capability (including the necessary managerial, operational, technical, and financial capability) to compete effectively in the sale of commercial health insurance products, and (ii) shall be accomplished so as to satisfy the United States that

none of the terms of any agreement between United and any purchaser gives United the ability to interfere with the purchaser's ability to compete effectively.

In California, the proposed Amended Final Judgment requires United immediately to stop exchanging certain kinds of information with CareTrust Networks, a wholly owned subsidiary of Blue Shield. United is prohibited from communicating with CareTrust about, among other things, new product introductions, negotiations over rates or other terms with physicians, or the development of any new provider networks. Those kinds of information exchanges were part of the basis for the competitive harm alleged in the Complaint. The proposed Amended Final Judgment also requires to discontinue renting the CareTrust provider network entirely effective one year after entry of the Amended Final Judgment for customers existing before the transaction was completed. United is permitted to continue renting CareTrust's network for up to one year in order to minimize any disruption caused by the transition of its current members from the CareTrust provider network to the PacifiCare network that United has acquired as part of this transaction.

The United States filed a proposed Amended Final Judgment to allow United's new customers (those receiving quotes after December 20, 2005, the day the Complaint and original Proposed Final Judgment were filed) to access the CareTrust Network until July 5, 2006. This modification will allow United to continue to offer in-network benefits to those members requiring such benefits in California. Using its newly acquired PacifiCare network for this purpose is impractical until United can complete the process of integrating certain features of the PacifiCare network and providers with its existing United claims processing and administrative systems.

### IV. Remedies Available to Potential Private Litigants

Section 4 of the Clayton Act (15 U.S.C. 15) provides that any person who has been injured as a result of conduct prohibited by the antitrust laws may bring suit in federal court to recover three times the damages the person has suffered as well as costs and reasonable attorney's fees. Entry of the proposed Amended Final Judgment will neither impair nor assist the bringing of any private antitrust damage action. Under the provisions of Section 5(a) of the Clayton Act (15 U.S.C. 16(a)), entry of the proposed Amended Final Judgment

has no prima facia effect in any subsequent private lawsuit that may be brought against United or PacifiCare.

### V. Procedures Available for Modification of the Proposed Amended Final Judgment

The parties have stipulated that the proposed Amended Final Judgment may be entered by the Court after compliance with the provisions of the APPA, provided that the plaintiff has not withdrawn its consent. The APPA conditions entry upon the Court's determination that the proposed Amended Final Judgment is in the public interest.

The APPA provides a period of at least sixty (60) days preceding the effective date of the proposed Amended Final Judgment within which any person may submit to the United States written comments regarding the proposed Amended Final Judgment. Any person who wishes to comment should do so within sixty (60) days of the date this Competitive Impact Statement is published in the **Federal Register**. All comments received during this period will be considered by the Department of Justice, which remains free to withdraw its consent to the proposed Amended Final Judgment at any time prior to the Court's entry of judgment. The comments and the response of the United States will be filed with the Court and published in the **Federal Register**.

Written comments should be submitted to: Mark J. Botti, Chief, Litigation I Section, Antitrust Division, U.S. Department of Justice, 1401 H St., NW., Suite 4000, Washington, DC 20530.

The proposed Amended Final Judgment provides that the Court will retain jurisdiction over this action and that the parties may apply to the Court for any order necessary or appropriate for the modification, interpretation, or enforcement of the Amended Final Judgment.

### VI. Alternatives to the Proposed Amended Final Judgment

The Department considered, as an alternative to the proposed Final Judgment, a full trial on the merits of the Complaint against the defendants. The United States could have continued the litigation and sought preliminary and permanent injunctions against United's acquisition of PacifiCare. The Department is satisfied, however, that the divestitures of the assets and other relief contained in the proposed Amended Final Judgment will preserve viable competition in the relevant markets alleged in the Compliant.

### VII. Standard of Review Under the APPA for Proposed Amended Final Judgment

The APPA requires that proposed consent judgments in antitrust cases brought by the United States be subject to a sixty (60)-day comment period, after which the Court shall determine whether entry of the proposed Amended Final Judgment "is in the public interest." 15 U.S.C. 16(e)(1). In making that determination, the Court shall consider:

A. The competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and

B. The impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. 16(e)(1).

As the United States Court of Appeals for the District of Columbia Circuit has held, the APPA permits a court to consider, among other things, the relationship between the remedy secured and the specific allegations set forth in the government's complaint, whether the consent judgment is sufficiently clear, whether enforcement mechanisms are sufficient, and whether the consent judgment may positively harm third parties. *See United States* v. *Microsoft Corp.*, 56 F.3d 1448, 1458–62 (D.C. Cir. 1995).

"Nothing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene." 15 U.S.C. 16(e)(2). Thus, in conducting this inquiry, "[t]he court is nowhere compelled to go to trial or to engage in extended proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement through the consent decree process." 119 Cong. Rec. 24,598 (1973) (statement of Senator Tunney). Rather,

[a]bsent a showing of corrupt failure of the government to discharge its duty, the Court, in making its public interest finding, should * * * carefully consider the explanations of the government in the competitive impact statement and its responses to comments in order to determine whether those explanations are reasonable under the circumstances.

*United States* v. *Mid-America Dairymen, Inc.*, 1977–1 Trade Cas. (CCH) ¶ 61,508, at 71,980 (W.D. Mo. 1977).

Accordingly, with respect to the adequacy of the relief secured by the proposed Amended Final Judgment, a court may not "engage in an unrestricted evaluation of what relief would best serve the public." *United States* v. *BNS Inc.*, 858 F.2d 456, 462 (9th Cir. 1988) (citing *United States* v. *Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir. 1981)); *see also Microsoft*, 56 F.3d at 1460–62. The law requires that:

[t]he balancing of competing social and political interests affected by a proposed antitrust consent decree must be left, in the first instance, to the discretion of the Attorney General. The court's role in protecting the public interest is one of insuring that the government has not breached its duty to the public in consenting to the decree. The court is required to determine not whether a particular decree is the one that will best serve society, but whether the settlement is "within the reaches of the public interest." More elaborate requirements might undermine the effectiveness of antitrust enforcement by consent decree.

*Bechtel*, 648 F.2d at 666 (emphasis added) (citations omitted).

A proposed final judgment, therefore, need not eliminate every anticompetitive effect of a particular practice, nor guarantee free competition in the future. Court approval of a final judgment required a standard more flexible and less strict than the standard required for a finding of liability: "[A]proposed decree must be approved even if it falls short of the remedy the court would impose on its own, as long as it falls within the range of acceptability or is 'within the reaches of public interest.'" *United States* v. *AT&T Corp.*, 552 F. Supp. 131, 151 (D.D.C. 1982) (citations omitted) (quoting *Gillette*, 406 F. Supp. at 716), aff'd sub nom. Maryland v. *United States*. 460 U.S. 1001 (1983); *see also United States* v. *Alcan Aluminum Ltd.*, 605 F. Supp. 619, 622 (W.D. Ky. 1985) (approving the consent judgment even though the court would have imposed a greater remedy).

Moreover, the Court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its Complaint, and does not authorize the Court to "construct [its] own hypothetical case and then evaluate the decree against that case." *Microsoft*, 56 F.3d at 1459. Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by brinding a case in the first place," it follows that

"the court is only authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire into other matters that the United States did not pursue. *Id.* at 1459–60.

The proposed Amended Final Judgment here offers strong and effective relief that fully addresses the competitive harm posed by the transaction.

### VIII. Determinative Documents

There are no determinative materials or documents of the type described in section 2(b) of the APPA, 15 U.S.C. 16(b), that were considered by the United States in formulating the proposed Amended Final Judgment.

Dated: March 3, 2006.

Respectfully Submitted,

Nicole S. Gordon,
Jon B. Jacobs (DC Bar #412249),
Richard Martin,
Steven Brodsky,
Paul Torzilli,

*Attorneys, Litigation I Section, Antitrust Division, United States Department of Justice, City Center Building, 1401 H Street NW/, Suite 4000, Washington, DC 20530, (p) 202.307.0001, (f) 202.307.5802.*

### Certificate of Service

I hereby certify that on March 3, 2006, I caused the foregoing to be electronically filed with the Clerk of the Court by using the Electronic Case Filing System, which will send a notice of electronic filing to:

Laura A. Wilkinson, Weil, Gotshal & Manges LLP, 1300 Eye Street NW., Suite 900, Washington, DC 20005.

I further certify that I sent the foregoing via electronic mail to:

Fiona Schaeffer, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, NY 10153.

Nicole S. Gordon,

*Attorney, Litigation I Section, Antitrust Division, United States Department of Justice.*

[FR Doc. 06–2591 Filed 3–17–06; 8:45 am]

**BILLING CODE 4410–11–M**

---

## DEPARTMENT OF LABOR

### Office of the Secretary

### Child Labor Education Initiative

**AGENCY:** Bureau of International Labor Affairs, U.S. Department of Labor.

*Announcement Type:* Notice of Intent to Solicit Cooperative Agreement Applications.

**SUMMARY:** The U.S. Department of Labor (USDOL), Bureau of International Labor Affairs (ILAB), intends to obligate up to approximately U.S. $15 million to support cooperative agreement awards to organizations to develop and implement formal, non-formal, and vocational education projects as a means to combat exploitive child labor in the following three countries: (1) Egypt, (2) Peru, and (3) Tanzania. ILAB intends to solicit cooperative agreement applications from qualified organizations (*i.e.*, any commercial, international, educational, or non-profit organization capable of successfully developing and implementing education projects) to implement projects that focus on innovative ways to provide educational services to children engaged, or at risk of engaging, in exploitive labor. The projects should address the gaps and challenges to basic education found in the countries mentioned above. Please refer to *http://www.dol.gov/ILAB/grants/main.htm* for examples of previous notices of availability of funds and solicitations for cooperative agreement applications.

Information on the specific sectors, geographical regions, and funding levels for the potential projects in the countries listed above will be addressed in a solicitation(s) for cooperative agreement applications to be published prior to September 30, 2006. Potential applicants should not submit inquiries to USDOL for further information on these award opportunities until after USDOL's publication of the solicitations. For a list of frequently asked questions on Child Labor Education Initiative Solicitations for Cooperative Agreement Applications, please visit *http://www.dol.gov/ILAB/faq/faq36.htm.*

USDOL intends to hold a bidders' meeting on April 21, 2006 to answer questions potential applicants may have on Child Labor Education Initiative Solicitations for Cooperative Agreement process. Please see below for more information on the bidders' meeting.

**DATES:** *Key Dates:* A specific solicitation(s) for cooperative agreement applications will be published in the **Federal Register** and remain open for at least 30 days from the date of publication. All cooperative agreement awards will be made on or before September 30, 2006.

**ADDRESSES:** *Submission Address:* Applications, in response to solicitations published in the **Federal Register**, must be delivered to: U.S. Department of Labor, Procurement Services Center, 200 Constitution Avenue, NW., Room N–5416, Attention: Lisa Harvey, Washington, DC 20210.

**FOR FURTHER INFORMATION CONTACT:** Ms. Lisa Harvey. E-mail address: *harvey.lisa@dol.gov*. All inquiries should make reference to the USDOL Child Labor Education Initiative— Solicitations for Cooperative Agreement Applications.

*Bidders' Meeting:* A bidders' meeting will be held in Washington, DC at the Department of Labor on Friday, April 21, 2006 from 9:30 a.m. to 11:30 a.m. The purpose of this meeting is to provide potential applicants with the opportunity to ask questions concerning the Child Labor Education Initiative Solicitation for Cooperative Agreement process. To register for the meeting, please call or e-mail Ms. Alexa Gunter (Phone: 202–693–4843; e-mail: *gunter.alexa@dol.gov*) by April 7, 2006. Please provide Ms. Gunter with contact information including name, organization, address, phone number, and e-mail address of the attendees.

*Background Information:* Since 1995, USDOL has supported a worldwide technical assistance program implemented by the International Labor Organization's International Program on the Elimination of Child Labor (ILO– IPEC). ILAB has also supported the efforts of other organizations involved in efforts to combat child labor internationally through the promotion of educational opportunities for children-in-need. In total, ILAB has provided over U.S. $400 million to ILO- IPEC and other organizations for international technical assistance to combat abusive child labor around the world.

In FY 2006, USDOL's appropriations included funds earmarked for ILO–IPEC and additional funding for bilateral assistance to improve access to basic education internationally in areas with a high rate of abusive and exploitive child labor. All FY 2006 funds will be obligated on or before September 30, 2006.

USDOL's Child Labor Education Initiative seeks to nurture the development, health, safety, and enhanced future employability of children around the world by increasing access to basic education for children removed from child labor or at risk of entering it. Eliminating child labor depends, in part, on improving access to, quality of, and relevance of educational and training opportunities for children under 18 years of age. Without improving such opportunities, children withdrawn from exploitive forms of labor may not have viable alternatives to child labor and may be more likely to return to such work or resort to other hazardous means of subsistence.